IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

ALEX J. FOGARTY,                          :
                                          :
          Plaintiff,                      :
                                          :
     v.                                   :          3:12-CV-01700
                                          :
CAROLYN W. COLVIN, ACTING                 :          (JUDGE MARIANI)
COMMISSIONER OF SOCIAL                    :
SECURITY,                                 :
                                          :
          Defendant.                      :

**MEMORANDUM**

FILED
SCRANTON
MAY 29 2014
PER _____
DEPUTY CLERK

## Introduction

Plaintiff Alex J. Fogarty has filed this action seeking review of a decision of the

Commissioner of Social Security ("Commissioner") denying Fogarty's claim for

supplemental security income benefits.

Fogarty protectively filed[1] his application for disability insurance benefits on

November 17, 2008. Tr. 13, 105. Fogarty claims that he became disabled on April 27,

2004. Tr. 107. Fogarty has been diagnosed with several impairments, including blindness

in his right eye, depression, anxiety disorder, post-traumatic stress disorder, oppositional

defiance disorder, and marijuana dependence. Tr. 15. On March 30, 2009, Fogarty's

application was initially denied by the Bureau of Disability Determination. Tr. 83.

---

[1] Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

On May 13, 2009, Fogarty requested a hearing before an administrative law judge ("ALJ"). Tr. 90. The ALJ conducted a hearing on June 29, 2010, where Fogarty was represented by counsel. Tr. 31-54. On September 21, 2010, the ALJ issued a decision denying Fogarty's application. Tr. 13-23. On June 20, 2012, the Appeals Council declined to grant review. Tr. 1. Fogarty filed a complaint before this Court on August 24, 2012. Supporting and opposing briefs were submitted and this case became ripe for disposition on February 26, 2013, when Fogarty declined to file a reply brief.

Fogarty appeals the ALJ's determination on four grounds: (1) the ALJ erred in finding that Fogarty's mental impairments did not meet or equal a listing at step three, (2) the ALJ improperly evaluated and/or reached an improper credibility determination regarding Fogarty's subjective complaints of physical symptoms, (3) the ALJ erred in failing to account for the side effects or effectiveness of Fogarty 's medications, and (4) the ALJ erred in finding that Fogarty could do work at any exertional level. For the reasons set forth below, the decision of the Commissioner is affirmed.

## Statement of Relevant Facts

Fogarty is 24 years of age, obtained his GED, and is able to read, write, speak and understand the English language. Tr. 34. Fogarty has not had any vocational training, and has no past relevant work. Tr. 21, 34, 130.

## A.    Fogarty's Physical Impairments

On April 27, 2004, a piece of glass flew into Fogarty's right eye while he was playing basketball; this piece of glass created an "ocular wound" that extended "across the inferior aspect of the cornea from approximately 7 o'clock to 5 o'clock, and then extended radially into the sclera for another approximate 4 mm at the 5 o'clock hour." Tr. 170, 177.  Fogarty's treating physician noted that the laceration to created a "ruptured globe;" Fogarty underwent "ruptured globe repair" surgery that night in an attempt to repair the damage done to his eye. Tr. 169.  Fogarty underwent two further surgeries in an attempt to restore vision in his eye. Tr. 190, 249.  Unfortunately, the surgeries were unsuccessful and on May 7, 2007, it was noted that Fogarty had only light perception in his right eye. Tr. 196.  It is undisputed that Fogarty is essential blind in his right eye today, with no hope that he will regain vision in this eye.

When Fogarty was a child, he had suffered from three seizures, one in 1998, and two in August of 2000. Tr. 422.  An MRI scan of Fogarty's brain was performed on November 14, 2000; this scan was unremarkable except for a Chiari I Malformation.[2] Tr. 412.  A January 2002 EEG was within normal limits. Tr. 419.  On January 13, 2003, Glenn Stayer, MD diagnosed Fogarty with seizure disorder, but noted that Fogarty had not taken seizure medication since July 2002 and had not had a seizure since 2000. Tr. 422.  On

---

[2] A Chiari Malformation "is a condition in which brain tissue extends into your spinal canal. It occurs when part of your skull is abnormally small or misshapen, pressing on your brain and forcing it downward." Mayoclinic.com, Chiari Malformation Definition, *available at* http://www.mayoclinic.org/diseases-conditions/chiari-malformation/basics/definition/CON-20031115 (last visited May 12, 2014).

3

October 23, 2007, Fogarty suffered another seizure; he was not diagnosed with seizure disorder at that time, and a CT scan revealed no abnormalities. Tr. 309-18, 321. On March 26, 2009, both Fogarty and his mother stated that he had previously suffered from seizures, but he "grew out of" the disorder. Tr. 376-77.

Based on the evidence contained in Fogarty's medical records Maura Smith-Mitsky, MD, completed a physical residual functional capacity assessment. Tr. 296-302. Dr. Smith-Mitsky opined that Fogarty had no exertional limitations whatsoever, as well as no postural, manipulative, communicative, or environmental limitations. Tr. 297-99. Dr. Mitsky-Smith did believe that Fogarty was limited in his depth perception and field of vision. Tr. 298.

### B.    Fogarty's Mental Impairments

Medical records relating to Fogarty's mental impairments begin on February 10, 2009, when Fogarty presented to Jennifer Brant, MS for an initial intake session relating to anxiety and depression. Tr. 278. Fogarty continued to receive treatment from Ms. Brant through June of 2010;[3] at these sessions Fogarty frequently reported decreased anxiety and depression, although he did often report increased anxiety, particularly when he was dealing with legal issues or traumatic events. Tr. 380, 381, 383, 387, 402, 403.

On March 26, 2009, Fogarty had his first appointment with Elmer Cupino, MD, and Dr. Cupino's assistant, Erica McDonald, PA-C. Tr. 376. Fogarty noted that nothing made

---

[3] Fogarty had appointments with Ms. Brant on February 24, 2009, March 11, 2009, March 25, 2009, April 1, 2009, April 8, 2009, April 22, 2009, May 6, 2009, May 12, 2009, May 20, 2009, June 17, 2009, July 1, 2009, July 29, 2009, August 12, 2009, September 16, 2009, October 14, 2009, January 14, 2010, March 5, 2010, May 12, 2010, and June 3, 2010. Tr. 276, 277, 382-394, 402, 403.

him happy, and he would start shaking badly when he was around glass or flying objects. *Id.* Fogarty reported that he had trouble concentrating, but that if he were "interested in something, [he] could concentrate." *Id.* Fogarty also relayed that he had significant anger issues throughout his life, and would occasionally punch walls. *Id.* Fogarty admitted that he did not listen to authority figures and had difficult taking orders; to this end, he stated that he had left six different jobs after only one day because he could not tolerate being told what to do all day. *Id.* Dr. Cupino[4] noted that Fogarty's mood was euthymic with a congruent affect and assessed Fogarty with a GAF score of 50-55.[5] Tr. 378. Fogarty was diagnosed with chronic post-traumatic stress disorder, oppositional defiance disorder, and marijuana dependence, although bipolar disorder was ruled out. *Id.*

On April 22, 2009, Fogarty had a follow-up appointment with Dr. Cupino. Tr. 373. At this appointment, Fogarty complained of crying one minute and being angry the next; he reported his mood was three out of ten. Tr. 373-74. Dr. Cupino noted that Fogarty had a depressed mood with a constricted affect, and assigned a GAF score of 50-55. Tr. 373. Dr. Cupino increased Fogarty's does of Zoloft. Tr. 374. At Fogarty's next appointment on May 20, 2009, he reported that his mood was much better, and he had noticed a fifty percent

---

[4] All reports are signed by both Dr. Cupino and Ms. McDonald; for the sake of simplicity, only Dr. Cupino will be referenced.

[5] A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed., Text rev., 2000). A score of 50 is on the borderline between serious and moderate symptoms. GAF scores between 51 and 60 indicate moderate symptoms (e.g., circumstantial speech and occasional panic attacks or moderate difficulty in social or occupational functioning as evidenced by new friends conflicts with peers or coworkers).

improvement since his Zoloft dose was increased. Tr. 371. Dr. Cupino noted that Fogarty

had a euthymic mood with a "brighter affect" and assigned a GAF score of 65.[6] *Id.*

On July 1, 2009, Fogarty reported that while Zoloft had worked for a while, he

eventually cried for a week straight and had suicidal thoughts. Tr. 369. At that point,

Fogarty stopped taking Zoloft and reported that these symptoms disappeared. *Id.* Fogarty

stated that he was very upset because he had recently witnessed his friend's brother die

after being hit by a car. *Id.* Dr. Cupino noted that Fogarty had a euthymic mood, but

assigned a GAF score of 55. *Id.* On August 12, 2009, Fogarty had another appointment

with Dr. Cupino. Tr. 266. Fogarty reported constant panic attacks and a 4/10 mood due to

the fact that he had recently been arrested. *Id.* Dr. Cupino assigned Fogarty a GAF score

of 50 and increased his Paxil dose. Tr. 266-67.

On September 9, 2009, Fogarty reported that he was doing much better and had

seen an eighty percent improvement in his mood and anxiety since his Paxil dose had been

increased. Tr. 364. Fogarty stated that he spent his days riding his ATV and "staying out of

trouble." *Id.* Dr. Cupino noted that Fogarty's mood was euthymic with a congruent affect

and assigned a GAF score of 65. *Id.* On December 9, 2009, Fogarty reported that Paxil

made him "feel weird," so Dr. Cupino discontinued this medication. Tr. 362-63. Dr. Cupino

assigned a GAF score of 65 and prescribed Buspar and Wellbutrin. *Id.* At his next

---

[6] A GAF score of 61-70 is indicative of "some mild symptoms" such as depressed mood and mild insomnia, or some difficulty in social, occupational, or school functioning, but generally the individual is functioning well and has some meaningful interpersonal relationships. *Diagnostic and Statistical Manual of Mental Disorder*, 32 (4th ed. Text rev. 2000).

appointment on January 21, 2010, Fogarty reported that he had seen a significant improvement since beginning Wellbutrin, with a reported mood of 8/10, with ten being his normal, happy self. Tr. 360. He reported that his anxiety and sleep had improved; Dr. Cupino assigned a GAF score of 65. *Id.*

On March 9, 2010, Fogarty stated that he was stressed over an upcoming court hearing for his arrest. Tr. 401. Dr. Cupino stressed that Fogarty needed to refrain from marijuana use, as the drug counteracted his prescription medication. *Id.* Dr. Cupino assigned a GAF score of 50. On March 17, 2010, Fogarty reported that he was having several panic attacks per day, and that he had discontinued Buspar due to headaches. Tr. 399. Dr. Cupino increased Fogarty's dose of Wellbutrin and assigned a GAF score of 55-60. Fogarty's final appointment with Dr. Cupino occurred on April 28, 2010. Tr. 396. There, Fogarty reported that he was having fewer panic attacks, and his mood has increased by sixty percent since his dose of Wellbutrin had been increased. *Id.* Dr. Cupino assigned Fogarty a GAF score of 65. *Id.*

On March 10, 2009, Fogerty was evaluated by David O'Connell, Ph.D., a state agency consultant. Tr. 270-73. Fogarty reported a fear of losing his left eye vision, but stated that he liked to play video games and cook, and that he hoped to open a restaurant in the future. Tr. 271. Dr. O'Connell's mental status examination revealed that Fogarty was cooperative with an appropriate affect and moderately blunted expression. Tr. 271. While Fogarty described anxiety and fear of something happening to his good eye, there were no

7

signs of psychosis, there was no disregulation of moods or affects, and there were no

obvious cognitive, perceptual, speech, or language disturbances.  Tr. 272.  Fogarty had no

suicidal or homicidal thoughts or plans; his judgment appeared sound; he was alert and

oriented; his impulse control appeared sound; and although his insight was low, he was a

reliable source of information about himself.  Tr. 272.

Dr. O'Connell diagnosed dysthymia and an anxiety disorder not otherwise specified,

and assigned a GAF score of 40.[7]  Tr. 272-73.  In assessing Fogarty's activities of daily

living, Dr. O'Connell noted that Fogarty could shop, cook, and clean, although he stopped

doing sports and other activities because of fear of losing his vision.  Tr. 273.  Regarding

social functioning, Dr. O'Connell observed that Fogarty demonstrated some social

withdrawal but could act appropriately with family, friends, neighbors, and the general

public.  Id.  As for concentration, persistence, or pace, Fogarty could cook meals, read

"when he ha[d] to," listen to the radio, watch television, and play the guitar.  Id.  Dr.

O'Connell found a marked limitation in responding appropriately to changes in a routine

setting; moderate limitations in responding appropriately to work pressures, making

judgments on simple work-related decisions, and carrying out detailed instructions; slight

limitations in understanding and remembering detailed instructions and interacting

---

[7] A GAF score of 31-40 signifies "some impairment in reality testing or communication ... or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed., Text rev., 2000). A score of 40 is on the borderline between "some impairment" and serious symptoms. A GAF score of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

appropriately with the public, supervisors, and co-workers; and no limitation in understanding, remembering, and carrying out short, simple instructions.  Tr. 274.

On March 25, 2009, a state agency psychologist, Salvatore Cullari, Ph.D., assessed Fogarty's mental residual functional capacity.  Tr. 279-82.  Based on his review of the record, Dr. Cullari concluded that Fogarty could be expected to understand and remember simple one and two-step instructions; perform simple, routine, repetitive work in a stable environment; make simple decisions; carry out very short and simple instructions; interact appropriately with the general public; ask simple questions and accept instruction; sustain an ordinary routine without special supervision; and function in production-oriented jobs requiring little independent decision making.  Tr. 281.  Dr. Cullari further opined that Fogarty had mild restrictions in his activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and had no episodes of decompensation of an extended duration.[8]  Tr. 293.

### C.    The Administrative Hearing

On June 29, 2010, Fogarty's administrative hearing was conducted.  Tr. 31-54.  At that hearing, Fogarty testified that he saw a psychiatrist about once a month for his mental impairments, and a therapist about once every two weeks.  Tr. 36.  Fogarty also testified that he enjoyed playing the guitar, walking playing video games, and using the computer.  Tr. 37.  Fogarty stated that he got along well with his family, but had panic attacks when he

---

[8] "Repeated episodes of decompensation, each for an extended duration" means three episodes within one year, or an average of once every four months, each lasting for at least two weeks. 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)(4).

9

was around other people. Tr. 38. Fogarty also stated that the medications "mild" his mental impairments, but "it's always still there." Tr. 40. Fogarty also testified that he never held a job for very long because he was concerned he would injure his good eye, and he was afraid to leave his house for the same reason. Tr. 42-43. Regarding his depression, Fogarty stated that he often cried for no reason. Tr. 43. After Fogarty testified, his father, Joseph Fogarty testified. Tr. 47-50. He testified that Fogarty has gone into a shell since losing his eye, and was a "totally different kid" since the accident, although his depression had improved significantly since seeing a psychiatrist. Tr. 47-49.

Finally, Carmine Abraham, an impartial vocational expert, was called to give testimony. Tr. 50. The ALJ asked the vocational expert to assume a hypothetical individual with Fogarty's age, education, and work experience who could perform work at any exertional level. Tr. 51. The ALJ stated that this hypothetical individual had limited depth perception and a limited field of vision due to blindness in the right eye. *Id.* Furthermore, the ALJ asked the vocational expert to assume that the individual would need to avoid hazards such as moving machinery and jobs that would entail dust, debris, or airborne particulates. *Id.* Finally, the ALJ limited this hypothetical individual to simple, routine tasks, low stress, and jobs that required only occasional decision making and only occasional changes in the work setting. *Id.*

The vocational expert opined that, given these hypothetical restrictions, the individual would be capable of performing three other jobs that exist in significant numbers in the

national economy: a packager, an order filer, and a cafeteria attendant.  Tr. 51-52.  The ALJ

then modified the hypothetical question so that the individual should never interact with the

public, but could occasionally interact with co-workers.  Tr. 52.  Under this scenario, the

vocational expert testified that the hypothetical individual could work as a packager, an

order filler, or a housekeeper.  Tr. 52-53.

## Discussion

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision

denying a plaintiff's claim for disability benefits, the district court must uphold the findings of

the Commissioner so long as those findings are supported by substantial evidence.

Substantial evidence "does not mean a large or considerable amount of evidence, but

'rather such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), quoting *Consolidated Edison*

*Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Substantial evidence has been described as

more than a mere scintilla of evidence but less than a preponderance.  *Brown v. Bowen*,

845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed factual record substantial

evidence may be "something less than the weight of the evidence, and the possibility of

drawing two inconsistent conclusions from the evidence does not prevent an administrative

agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar.*

*Comm'n*, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 (3d Cir. 2008).  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims.  *See* 20 C.F.R. § 404.1520; *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007).  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  *See* 20 C.F.R. § 404.1520.  The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the

Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason*, 994 F.2d at 1064.

### A.    Step One

The ALJ at step one of the sequential evaluation process found that Fogarty had not engaged in substantial gainful work activity since November 17, 2008, the application date. Tr. 16. Fogarty does not allege error with this finding.

### B.    Step Two

At step two of the sequential evaluation process, the ALJ found that Fogarty suffered from three severe impairments: status ruptured right eye, depression, and post-traumatic stress disorder. Tr. 15. Fogarty likewise does not allege error with this finding.

### C.    Step Three

At step three, the ALJ concluded that Fogarty did not suffer from an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. Tr. 15-16. Fogarty argues that the ALJ erred in finding that his mental impairments did not meet or equal listings 12.04 (affective disorders) or 12.06 (anxiety-related disorders) under the "paragraph B" criteria.

To be considered disabled at step three of the sequential evaluation process, an impairment or combination of impairments must meet or medically equal an impairment listed in the Social Security Administration's Regulations. *Williams v. Sullivan*, 970 F.2d

1178, 1186 (3d Cir. 1992). "'For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.'" *Id.*, quoting *Sullivan v. Zebley*, 493 U.S. 521, 529–30 (1990) (emphasis in original). In order to meet the 12.04 or 12.06 listings, a claimant must establish that she or he suffers from that disorder and that the disorder causes two of the following "paragraph B" criteria: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06.

The ALJ concluded that Fogarty did not meet any of the four criteria. Tr. 16. The ALJ found that Fogarty suffered from only minor restrictions in his activities of daily living since he was able to care for his own personal needs, perform light household chores, play the guitar, and ride all-terrain vehicles. *Id.* The ALJ also found that Fogarty had moderate difficulties in social functioning. *Id.* The ALJ noted that Fogarty was self-conscious about his injury and did not like to be around other people, although he acted appropriately with his treating and examining doctors, and got along well with his family. *Id.* The ALJ further found that Fogarty's dysthymia and post-traumatic stress disorder caused moderate difficulties with his concentration, persistence, or pace. *Id.* Finally, the ALJ found that

Fogarty had suffered from no episodes of decompensation that lasted for an extended duration. *Id.*

These findings largely mirrored the findings of Dr. Cullari in the mental residual functional capacity assessment he filled out in March of 2009. Tr. 279-95. There, Dr. Cullari likewise opined that Fogarty suffered from mild limitations in his activities of daily living, moderate limitations in maintaining social functioning and in maintaining concentration, persistence, or pace, and had suffered from no episodes of decompensation. Tr. 293. Dr. Cullari in turn based his assessment in large part upon the findings of an examining psychologist, Dr. O'Connell. Tr. 281. Dr. O'Connell offered a detailed assessment of Fogarty's mental impairments, including an examination of his activities of daily living, social functioning, and concentration, persistence, or pace. Tr. 273. As Dr. O'Connell's findings were consistent with the evidence contained in the medical records, Dr. Cullari gave these findings "great weight and adopted [them] in [his] assessment." Tr. 281.

The ALJ cited to evidence supporting his findings for each of the various criteria. Only two doctors of record, Dr. O'Connell and Dr. Cullari, offered opinions on the impact that Fogarty's mental impairments on the four paragraph B criteria. The ALJ's opinion largely mirrors both of these medical opinions. Significantly, Fogarty cannot cite to any medical opinion contradicting the ALJ's conclusions. For those reasons, the ALJ's determination at step three of the sequential evaluation process is supported by substantial evidence.

**D.    Step Four**

At step four of sequential evaluation process, the ALJ found that Fogarty maintained

the residual functional capacity to perform a full range of work at all exertional levels, but

had limited depth perception and field of vision.  Tr. 16.  The ALJ found that Fogarty must

avoid moving machinery and unprotected heights, and could not work in environments with

dust, debris, or airborne debris.  *Id.*  Finally, the ALJ found that Fogarty was limited to

simple, routine tasks and low stress, with only occasional decision making and only

occasional changes in the work setting, and no interaction with the general public.  *Id.*

Fogarty challenges this residual functional capacity determination on three grounds.

First, Fogarty contends that the ALJ failed to properly evaluate his subjective claims of

physical symptoms, and did not properly evaluate his credibility regarding these subjective

claims.  Second, Fogarty argues that the ALJ did not properly consider the side effects and

effectiveness of his medication.  Finally, Fogarty argues that the ALJ erred in finding that

Fogarty could perform work at any exertional level.

i.    The ALJ's Assessment of Fogarty's Symptoms and Credibility

Fogarty argues that the ALJ did not properly consider his anxiety and related panic

attacks, depression, or seizure disorder.  As an initial matter, Fogarty's allegations of

seizure disorder are unsubstantiated by the administrative record.  While Fogarty had been

diagnosed with seizure disorder as a child, tr. 321, by his own admission he had "outgrown"

this disorder prior to the alleged date of disability.  Tr. 376.  No medical records during the

period of time between the alleged date of disability and the administrative hearing include a

diagnosis of seizure disorder, and no objective medical findings support such a diagnosis.

Consequently, it was not error for the ALJ to not address the alleged seizure disorder in the

opinion.[9]

The ALJ considered Fogarty's depression and anxiety, and noted that Fogarty cried

for no reason, had decreased energy and concentration, and a loss of interest in activities.

Tr. 17-18. The ALJ further noted that Fogarty had outbursts of anger and largely confined

himself to his home. Tr. 18. The ALJ also noted that Fogarty claimed he did not shop and

avoided crowds due to his panic attacks. Tr. 19. However, the ALJ cited to significant

amounts of evidence in support of his conclusion that Fogarty's allegations of symptoms

were not entirely credible.

The ALJ noted that Fogarty had admitted that counseling helped with his mental

impairments and that, while his symptoms were still present, medication helped control

these symptoms. Tr. 20. The ALJ also found it significant that, while Fogarty claimed

disabling symptoms related to his mental impairments, he did not begin psychological

therapy until nearly five years after his accident. *Id.* The ALJ noted that Fogarty's medical

records showed that his mood was generally euthymic, with some anxiety. *Id.* The ALJ

further cited to the fact that Fogarty generally denied having difficulty with depression. *Id.*

The ALJ also noted that the only times Fogarty reported a substantial increase in anxiety

---

[9] In any event, Fogarty has not alleged how such a diagnosis would contribute to an inability to
work, and therefore any error here was harmless. See *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir.
2002).

was when he had been arrested, was facing sentencing for that arrest, or had just witnessed the death of a friend's brother. *Id.* The ALJ also noted that Fogarty's treating psychologist frequently assessed Fogarty with a GAF score of 65. *Id.*

The ALJ devoted nearly five pages of his opinion to an examination of the relevant medical evidence and medical opinions, and reached a well-reasoned conclusion based on an overwhelming amount of evidence. The ALJ also gave significant weight to the medical opinions of Dr. O'Connell and Fogarty's treating physician, Dr. Cupino which supported the ALJ's finding that Fogarty's symptoms were not as severe as he alleged. The only area of conflict between these two opinions was the assessment of Fogarty's GAF score; Dr. O'Connell assessed Fogarty with a GAF score of 40 in March 2009, while Dr. Cupino assessed Fogarty with a GAF score of 65 in September of 2009. Tr. 21. The ALJ properly resolved this conflict by giving greater weight to Dr. Cupino on the basis that Dr. Cupino was Fogarty's treating physician, and the finding was consistent with the evidence of record.[10] *Id.* Based on the totality of evidence, the ALJ's conclusion that Fogarty's allegations of symptoms were not entirely credible is supported by substantial evidence.

ii.     Fogarty's Medication Effectiveness and Side Effects

Fogarty next argues that the ALJ failed to account for the effectiveness and side effects of his medication. While Fogarty generally argues that the ALJ did not address issues related to the side effects of his medication, Fogarty does not cite to a single side

---

[10] The ALJ would have been justified in crediting Dr. Cupino's opinion based on the treating physician rule alone, a rule that is recognized in the United States Court of Appeals for the Third Circuit. See *Morales v. Apfel*, 225 F.3d 310, 316-18 (3d Cir. 2000).

effect that the ALJ did not address.  Three medications, Paxil, Zoloft, and Buspar, caused

Fogarty side effects, and were therefore discontinued as a form of treatment.  Tr. 362, 369,

399.  Fogarty had not complained of any side effects from medications he was taking at the

time of the administrative hearing, either to his doctors or to the ALJ.  Consequently, the

ALJ did not fail to account for side effects of Fogarty's medications.

The ALJ also sufficiently evaluated the effectiveness of Fogarty's medications.

Fogarty himself admitted that his medication helped with his anxiety and depression,

although he stated that the symptoms were still present.  Tr. 40.  The ALJ observed that

Fogarty's treating physician noted his mood was generally euthymic, and noted that Fogarty

had reported significant improvements with changed medications.  Tr. 18.  In that vein, the

ALJ noted that after a change of medication in September of 2009, Fogarty reported an

eighty percent improvement in his anxiety and mood.  *Id.*  The ALJ stated that in December

of 2009, after another medication adjustment, Fogarty again reported a significant

improvement in his mood and anxiety.  Tr. 19.  Finally, the ALJ noted that in April of 2010,

Fogarty reported his panic attacks had lessened and his mood had improved by sixty

percent with his medication adjustment.  *Id.*  The evidence and reasoning of the ALJ were

more than adequate, and the determination that Fogarty's medication was sufficiently

effective to allow work in a low stress environment is supported by substantial evidence.

19

iii.    The ALJ's Determination of Fogarty's Exertional Limits

Finally, Fogarty argues that the ALJ improperly determined that he could perform work at any exertional level.  Dr. Smith-Mitsky was the only doctor who offered an opinion of Fogarty's physical residual functional capacity, and she opined that Fogarty had no exertional limitations.  Tr. 297.  No evidence exists within the administrative record that suggests Fogarty had any exertional limitations whatsoever.  The ALJ's determination in this matter is entitled to great weight, particularly where there is no objective medical evidence or medical opinion within the administrative record contradicting such a finding.  See *Burns v. Barnhart*, 312 F.3d 113, 129 (3d Cir. 2002) ("Importantly, [the claimant] does not point to any relevant medical opinion that supports his allegations that his . . . exertional limitations are more severe than the ALJ found them to be.").  Therefore, the ALJ's determination at step four is supported by substantial evidence.

**E.    Step Five**

At step five, the ALJ concluded that Fogarty was capable of performing three jobs that exist in significant numbers in the national economy.  Tr. 22.  In making this determination, the ALJ posed a hypothetical question to a vocational expert that accurately reflected Fogarty's residual functional capacity.  Tr. 51-52.  The vocational expert testified that, under the circumstances presented in the hypothetical question, the individual would be able to perform three jobs that exist in significant numbers in the national economy.  Tr. 52-53.  As the hypothetical question posed accurately reflected Fogarty's residual functional

20

capacity, the ALJ's determination that Fogarty could perform jobs that exist in a significant number in the national economy is supported by substantial evidence.

## Conclusion

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is affirmed.

An appropriate Order will be entered.

BY THE COURT:

Robert D. Mariani
United States District Judge

Dated: May _____ , 2014

21